[No. 14006.   Department One.   August 24, 1917.]

J. C. SWEET, *Respondent*, v. OREGON-WASHINGTON LUMBER & MANUFACTURING COMPANY, *Appellant*.[1]

PRINCIPAL AND AGENT—POWERS OF AGENT—EVIDENCE—SUFFICIENCY—ESTOPPEL.  Where an agent, authorized to inspect and fix a price for lumber to be purchased subject to approval, was sent to the mill of a customer to buy lumber, and finding the same in operation by lien claimants in possession, negotiated with them a cash sale, waiving his principal's claim for a set-off upon the account of the former owner of the mill without reporting such fact to his principal, it will be held that he acted within the scope of his apparent authority in agreeing to pay cash; the principle that the one of two innocent parties whose negligence occasioned a loss, must be charged with it, operating, if applicable at all, against the buyer and not the seller.

BANKRUPTCY—ACTIONS BY TRUSTEE—TITLE TO PROPERTY SUBJECT TO LIENS—RELIEF.  A trustee in bankruptcy may maintain an action for the contract price of lumber manufactured and sold by lien-holding employees in possession and operating the mill with the bankrupt's consent, since the title to the lumber was in the bankrupt, and the distribution of the fund and protection of the lien-holders are matters peculiarly within the province of the bankruptcy court.

Appeal from a judgment of the superior court for Whatcom county, Pemberton, J., entered June 14, 1916, upon the verdict of a jury rendered in favor of the plaintiff, in an action by a trustee to recover property belonging to the estate of a bankrupt.   Affirmed.

*McClure & McClure* and *Will J. Griswold*, for appellant.

*Bixby & Nightingale*, for respondent.

[1]Reported in 167 Pac. 82.

CHADWICK, J.—This action was brought by the trustee in bankruptcy of a copartnership consisting of Jason Adkinson and Cicero M. Coffman and doing business under the name and style of the Everson Lumber Company. The company had become indebted to the appellant, with which it had had some previous dealings, in the sum of $305.21. The partnership was dissolved in July, 1915, the business being continued by Adkinson. One or more cars of lumber had been ordered and the proceeds placed to the credit of the company. Negotiations were opened for other cars. In October, one Gearhardt, a clerk who inspected purchases of lumber for appellant, went to the mill, which had been put in the hands of its employees. The employees, under the superintendency of one Warriner, were operating the mill with the intent, or possibly the hope, of paying wages to themselves and past claims for which liens had been filed. The laborers had been placed in charge to avoid the costs and expenses incident to foreclosure. Gearhardt negotiated with Adkinson, who admits that he knew from former dealings that all orders given by Gearhardt were subject to the approval of appellant at its office in Seattle. Adkinson told Gearhardt that the men had filed liens and were in charge, as he had "forfeited his rights." Gearhardt then talked with Warriner. Gearhardt says that he bought the lumber; that it was not agreed that it was a cash sale; that he told Warriner that if he wanted to make it a cash sale he could draw a sight draft against the bill of lading. Warriner says that it was understood that the lumber was covered by liens and that Gearhardt agreed to pay for the lumber, waiving appellant's claim of set-off.

A careful reading of the testimony convinces us that the shipment was made by the lien claimants, acting through Warriner, upon the understanding and belief that the sale was a cash sale and that payment would promptly follow. When received, the value of the lumber was credited upon the open account of the Everson Lumber Company and the car

rebilled to a foreign state. After several days, a draft was drawn upon, and dishonored by, appellant. Up to that time appellant had no direct notice of the situation at the mill and acted within its understanding of its contract rights, its manner and custom of doing business with Adkinson. We are not inclined to discuss the testimony relative to the purchase of the lumber. The jury believed Warriner's testimony. This, coupled with the inherent probabilities attending the transaction, warrants us in giving our sanction to the finding of the jury that the lumber was sold upon a positive understanding that it was for the benefit of the lien claimants and would be paid for in cash.

Appellant's first, and possibly its principal contention, is that, whatever the fact may be, Gearhardt was no more than a clerk, and because of its custom (known to Adkinson) to approve all purchases at its home office, his promise to pay cash, if made, was clearly beyond the scope of his authority.

It will serve no purpose to discuss or quote from the many authorities cited. There is no branch of the law which calls for a consideration of the facts of the particular case more than that of agency. Its principles remain fixed and unchanged, but circumstances, even slight, will take a given case out of the authority of any given case.

In the case at bar, Gearhardt had an admitted authority to negotiate a price and to purchase. He was told by the owner, Adkinson, that he must deal with the lienholders. He found the lumber in their possession. A part of it had been set aside upon an order from a mill at Everett (an admittedly cash sale) at a higher price than appellant had expected to pay, and which Gearhardt agreed to meet. He knew, or must have known, that Warriner would not have shipped the lumber unless he was to receive, for the benefit of the men, the same or a better price. Appellant's managers may have had no intention of waiving its set-off. Upon the insistence that they had not, counsel insists that they are to be protected under the rule that, where a loss must occur to one

of two parties equally innocent, the loss must be charged to one through whose neglect or carelessness it occurred. It may be questioned whether this principle is involved; but if so, it would seem that the lien claimants should have the benefit of it. Whatever appellant expected or intended when it sent Gearhardt to the mill, he found a condition not then within their knowledge. It was in his power and, knowing that his company had a set-off, it was his duty to acquaint them with the situation. He did not do so. The legal result is that one authorized to inspect and to fix prices (he did so in this case) purchases lumber from strangers to Adkinson who would be put in the position of voluntarily surrendering a lien for a consideration moving to their debtor, who had become so poor that he could not meet the daily wages of his employees.

Agency is not proved or disproved ordinarily by assertion or denial. Like any other legal status, it may be proved by circumstances; and when one goes out into the market to buy and ship to a principal, the power to fix a price has always been considered sufficient to bind the principal to the payment of the price. We dismiss the question of agency and come to one that concerned us upon argument, but which we have come to believe must be resolved in favor of the respondent.

It is urged by appellant that plaintiff, being a trustee in bankruptcy for Adkinson and Coffman, is not a proper party plaintiff; that, if he recovers, it is upon the ownership of the bankrupt, and not upon the title of the lien claimants for whose benefit the action is waged; that, if the lumber belonged to the lien claimants, it was no part of the estate, and plaintiff "would have no authority to sue for its value if it belonged to a third party." Counsel say, "respondent introduced evidence intended to prove that these men were the owners of the lumber at the time the alleged new agreement was made." The testimony is not specifically referred to. It may be that Warriner or Adkinson, or both, said, under the

spur of counsel's questioning, that the lumber belonged to the
men. But that is a question of law to be resolved by the
court and not by the conclusion of the witness.

The legal title to the lumber was in Adkinson. The men
were lienholders in possession. When the concern was put
into bankruptcy, the trustee was authorized by law to take
possession of all of the assets of the estate, subject, of course,
to the rights of all lien claimants.

"Property upon which there is a valid lien passes to the
trustee if he elects to take it, subject to such equities, liens
or incumbrances, whether created by operation of law or by
the act of the bankrupt." 1 Loveland, Bankruptcy, § 436.

Such equity as there may be in the property after the
satisfaction of a lien is the property of the estate, and the
duty of the trustee to conserve all the assets is a sufficient
ground upon which to rest a right of recovery. The distri-
bution of the fund is a matter to be hereafter determined by
the bankruptcy court. Protection of those holding liens for
labor is peculiarly within the province of the bankruptcy
law. Black, Bankruptcy, p. 374.

Where an assignment had been made of a fund to protect
advances, the right of the trustee to maintain an action has
been upheld.

"The money due on this contract belonged to the estate
in bankruptcy subject to all valid liens, if any, and was
properly paid to the trustee, and it is his duty to administer
it or pay it over to those entitled thereto pursuant to the
order and direction of this court which has its custody for
the purposes of administration and distribution." *In re
Cramond*, 145 Fed. 966.

It may be said that appellant is proceeding upon the
theory that its rights are predicated upon the order for the
lumber given before Gearhardt went upon the ground and
before the liens were perfected and the property put into the
hands of the men. Whereas, the whole record shows that
such contract was not performed by Adkinson; that he in-
formed their agent that his power to perform was subject to

the will of the men, and that appellant's agent dealt with them as lienholders in possession and must meet the burden of the lien, it being agreed in argument that there is no fund out of which the liens may be paid, other than the amount due from appellant.

Upon the finding of the jury that appellant waived its offset, we find no error in the refusal of the court to allow an offset of $14 claimed by appellant.

Other assignments going to instructions given and refused are predicated upon appellant's theory of the case. Having rejected that, we find no prejudicial error.

The judgment. is affirmed.

ELLIS, C. J., MORRIS, MAIN, and PARKER, JJ., concur.